**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

| | | |
|---|---|---|
| JAMES YATES, | ) | |
| | ) | |
| *Plaintiff*, | ) | Civil Case No.: 1:25-cv-540 |
| | ) | |
| v. | ) | |
| | ) | |
| FRANCONNECT, LLC | ) | |
| | ) | |
| *Defendant*. | ) | |
| _____ | ) | |

**AMENDED MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
<u>FRANCONNECT, LLC'S MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................................iii

INTRODUCTION ...............................................................................................................1

STATEMENT OF UNDISPUTED FACTS .........................................................................2

I.     FranConnect, LLC ...................................................................................................2

II.    FranConnect's Sales Department ...........................................................................2

III.   James "Chris" Yates ................................................................................................4

      A.    Sales Quota .......................................................................................5

      B.    Ramping Period .................................................................................6

      C.    Supervisors and Sales Team...............................................................6

      D.    Territory Assignment .........................................................................7

      E.    Annual Territory Reassignment ..........................................................8

      F.    Mr. Yates's Performance in FY2023 ...................................................9

      G.    Yates Inherits Van Pelt's Accounts.....................................................9

      H.    FranConnect Hires Amanda Griffin as an Enterprise Account Executive............ 10

      I.    Mr. Yates's Performance in 1Q/2Q 2024 ...........................................11

      J.    Performance Improvement Plan ("PIP") .............................................11

      K.    Performance While on a PIP...............................................................12

      L.    PIP is Extended ................................................................................12

      M.   PIP is Extended Again........................................................................13

      N.    Complaint of Unfair Treatment...........................................................14

      O.    Offer to Transition to Account Manager Role or Be Terminated..........................15

STANDARD OF REVIEW ...............................................................................................16

ARGUMENT....................................................................................................................17

IV.   MR. YATES FAILS TO MEET HIS BURDEN THAT HE WAS DISCRIMINATED AGAINST BASED ON RACE ...............................................................................17

      A.    Mr. Yates's Performance as an Enterprise Account Executive Was Unsatisfactory ...................................................................................................18

      B.    Mr. Yates Has Not Identified Any Similarly-Situated Account Executives Who Were Treated Differently Than Him .......................................................19

      C.    FranConnect Has Articulated a Legitimate Non-Discriminatory Reason for Placing Mr. Yates on a PIP.............................................................................22

i

D.    Mr. Yates Was Compensated Fairly and Equitably ................................................ 23

E.    Mr. Yates's Remaining Allegations of Discrimination are Not Actionable .......... 24

V.    MR. YATES FAILS TO MEET HIS BURDEN THAT HE WAS RETALIATED AGAINST BY FRANCONNECT ................................................................................................... 25

A.    The Offer to Transition Yates to a New Position Was Not Retaliatory ................. 27

B.    Mr. Yates Cannot Establish that The Offer to Transition to an Account Manager Role or The Subsequent Termination of His Employment Was Because of His EEO Complaints .............................................................................................................. 28

C.    Mr. Yates's Commission and Paycheck Claims Fail Because Phoenix Brands Defaulted and No Commissions Were Earned ....................................................... 29

CONCLUSION ................................................................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Buck v. Modine Mfg. Co.*,
   776 F.Supp.3d 357 (W.D. Va. 2025) ......................................................................26

*Causey v. Balog*,
   162 F.3d 795 (4th Cir. 1998) ................................................................................16

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ............................................................................................16

*Chapman v. Wal-Mart, Inc.*,
   No. 5:20CV00105, 2021 WL 2379810 (W.D. Va. June 10, 2021) .........................19

*Clark Cnty. Sch. Dist. v. Breeden*,
   532 U.S. 268 (2001) ............................................................................................28

*Conkwright v. Westinghouse Elec. Corp.*,
   933 F.2d 231 (4th Cir.1991) ................................................................................18

*Cook v. CSX Transportation Corp.*,
   988 F.2d 507 (4th Cir.1993) ................................................................................19

*Foster v. Univ. of Maryland-E. Shore*,
   787 F.3d 243 (4th Cir. 2015) ...............................................................................26

*Francis v. Booz, Allen & Hamilton, Inc.*,
   452 F.3d 299 (4th Cir. 2006) ...............................................................................28

*Gary v. Facebook, Inc.*,
   822 F. App'x 175 (4th Cir. 2020) .........................................................................19

*Gomez v. Haystax Technology, Inc.*,
   292 F.Supp. 3d 676 (2017) ..................................................................................22

*Goode v. Cent. Virginia Legal Aid Soc'y, Inc.*,
   807 F.3d 619 (4th Cir. 2015) ...............................................................................17

*Haynes v. Waste Connections, Inc.*,
   922 F.3d 219 ......................................................................................................19

*Hooven-Lewis v. Caldera*,
   249 F.3d 259 (4th Cir. 2001) ...............................................................................16

iii

*Imungi v. Virginia Commonwealth Univ.*,
No. 23-1648, 2025 WL 2612761 (4th Cir. Sept. 10, 2025) ....................................................28

*Jiminez v. Mary Washington Coll.*,
57 F.3d 369 (4th Cir.1995) .......................................................................................................26

*Johnson v. United Parcel Serv., Inc.*,
839 F. App'x 781 (4th Cir. 2021) ......................................................................................17, 26

*Laing v. Fed. Exp. Corp.*,
703 F.3d 713 (4th Cir. 2013) .......................................................................................17, 26, 28

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973) ...........................................................................................................17, 26

*Mitchell v. Toledo Hosp.*,
964 F.2d 577 (6th Cir. 1992) ....................................................................................................19

*Road King Development, Inc. v. JTH Tax LLC*,
657 F.Supp.3d 780 (E.D. Va. 2023) .........................................................................................16

*Shun-Lung Chao v. Int'l Bus. Machines Corp.*,
424 F. App'x 259 (4th Cir. 2011)..............................................................................................28

*Smith v. Flax*,
618 F.2d 1062 (4th Cir. 1980) ..................................................................................................18

*St. Mary's Honor Ctr. v. Hicks*,
509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).........................................................26

*Univ. of Texas Sw. Med. Ctr. v. Nassar*,
570 U.S. 338 (2013).................................................................................................................26

*Washington v. Offender Aid & Restoration of Charlottesville-Albemarle, Inc.*,
677 F. Supp. 3d 383 (W.D. Va. 2023) ................................................................................17, 26

*Williams v. Newport News Sch. Bd.*,
No. 4:20-CV-41, 2021 WL 3674983 (E.D. Va. Aug. 19, 2021) ...............................................27

**Rules**

Fed. R. Civ. P. 56(a) .......................................................................................................................16

Fed. R. Civ. P. 56(c) .......................................................................................................................16

**Statutes**

42 U.S.C. § 1981................................................................................................................................1

42 U.S.C. § 2000e et seq. ...................................................................................................................1

Va. Code Ann. § 2.2-3011 ..............................................................................................................26

Va. Code § 2.2-3900 .........................................................................................................................1

Va. Code § 40.1-27.3 .........................................................................................................................1

## <u>INTRODUCTION</u>

In this action, Plaintiff James "Chris" Yates, a former Enterprise Account Executive for Defendant FranConnect, LLC ("FranConnect"), asserts claims of race discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.; 42 U.S.C. § 1981; the Virginia Human Rights Act, Va. Code § 2.2-3900 et seq.; and the Virginia Whistleblower Protection Law, Va. Code § 40.1-27.3. Mr. Yates alleges that FranConnect reassigned his most lucrative sales accounts to white colleagues, assigned him the "worst" accounts, paid him less than his peers, and subjected him to multiple Performance Improvement Plans ("PIPs") while allegedly similarly situated coworkers with comparable performance deficiencies were not placed on PIPs. He further claims that FranConnect retaliated against him for complaining of unfair treatment and filing an EEOC charge by offering to transition him to a different role after he failed to satisfy the terms of his PIPs, withheld commissions, shorted his final paycheck, and ultimately terminated his employment.

At the outset of this case, this Court accurately characterized Mr. Yates's allegations as "thin," while allowing him the opportunity to develop them through discovery. [July 10, 2025 Order (ECF No. 13)]. That opportunity has now passed. After extensive discovery – including the production of thousands of pages of documents and hours of sworn deposition testimony – Mr. Yates has failed to adduce evidence sufficient to support any of his claims. Indeed, at his own deposition, Mr. Yates repeatedly testified that he could not recall, did not know, or was unsure of the factual basis for his allegations, conceding a lack of evidentiary support for his claims hundreds of times.

By contrast, the undisputed record establishes that Mr. Yates consistently failed to meet FranConnect's legitimate performance expectations, including repeated failures to achieve his

sales quota and to satisfy the clear, objective requirements of his PIPs. The evidence further demonstrates that FranConnect's actions, including placing Mr. Yates on PIPs and later offering him an opportunity to transition to a role better aligned with his demonstrated strengths, were grounded in legitimate, nondiscriminatory business considerations. The proposed transition to a new role would have preserved his base salary and commission structure, removed him from the PIP, and placed him under a different supervisor, underscoring the absence of any retaliatory or discriminatory motive.

Because Mr. Yates cannot establish a prima facie case of discrimination or retaliation or rebut FranConnect's legitimate, nondiscriminatory reasons for its actions, there is no genuine dispute of material fact. FranConnect is therefore entitled to summary judgment on all claims.

<u>STATEMENT OF UNDISPUTED FACTS</u>

## I.    FranConnect, LLC

1. FranConnect, LLC ("FranConnect") is a leading software provider for franchise and multi-location businesses.

## II.    FranConnect's Sales Department

2. FranConnect's in-house sales team drives revenue for the company by acquiring new customers through prospecting, pitching, and relationship building, and they grow existing accounts by identifying needs and offering tailored solutions. *See* FranConnect-PROD_002175 attached as **Exhibit 1**.

3. FranConnect's sales department is structured by market size to ensure that each customer segment receives specialized support tailored to its operational scale. *Id.*

2

4. Small-Medium Business ("SMB") accounts include companies with approximately 2-75 locations and are managed by a sales team focused on the needs of smaller organizations. *See* Deposition of Dan Palay attached as **Exhibit 2** at 234:10-235:10.

5. Mid-Market Business ("MMB") accounts, consisting of businesses with 76-300 locations, are supported by a sales team equipped to handle more complex, growing operational demands. *Id.*

6. "Enterprise" accounts, defined as organizations with more than 300 locations, are managed by a dedicated team experienced in navigating large-scale, multi-layered operations and strategic partnerships. *Id.* at 106:20-108:17; 234:10-236:18.

7. FranConnect has added "Corporate Owned" or "Company Owned" businesses as a market segment that targets non-franchise businesses and their unique needs. *Id.* at 73:1-75:2.

8. This structure allows FranConnect to deliver targeted expertise and maximize value across all customer segments. *Id.* at 262:18-263:18; 2175

9. Within each market segment – SMB, MMB, and Enterprise – the sales team is composed of two primary roles: Account Executives and Account Managers. *See* Defendant's Response to Plaintiff's First Set of Interrogatories attached as **Exhibit 3** at No. 11; **Exhibit 2** at 229:2-233:21.

10. Account Executives focus on generating "new logo" business by identifying, engaging, and closing deals with prospective customers who do not have a relationship with FranConnect. **Exhibit 2** at 123:4-7; 2175.

11. An Account Executive's work is centered on growing their territories and driving new revenue streams. *Id.*

12. In contrast, Account Managers are responsible for nurturing and growing relationships with existing customers. **Exhibit 2** at 172:19-173:6.

13. Account Managers focus on account retention, upselling additional products or services, and ensuring customer satisfaction to maximize long-term value. *Id*; **Exhibit 3** at 11.

## III.    James "Chris" Yates

14. Plaintiff James "Chris" Yates was hired by FranConnect as an Enterprise Account Executive on February 21, 2023. *See* FranConnect-PROD_001653 attached as **Exhibit 4**.

15. When Mr. Yates was hired, his title was "Enterprise Sales Manager." *Id*.

16. In late 2023, Mr. Yates's title was changed to "Enterprise Account Executive." **Exhibit 4** at 11.

17. As an Enterprise Account Executive, Mr. Yates focused on acquiring new-logo accounts, which are the largest and most strategically significant customers in FranConnect's portfolio. **Exhibit 1**; **Exhibit 2 at** 106:20-108:17.

18. As an Enterprise Account Executive, Mr. Yates was responsible for identifying the largest franchise businesses, building relationships with C-suite leaders and senior executives, and guiding potential customers through complex, multi-layered decision-making and procurement processes. *Id*.

19. The sales cycle for Enterprise new-logo accounts is longer than any other market, typically lasting 6-12 months. **Exhibit 2** at 106:20-108:17.

20. The primary responsibility of an Enterprise Account Executive is securing new revenue and meeting their monthly/quarterly sales quota. *See* FranConnect-PROD_1717 attached as **Exhibit 5**; **Exhibit 1**.

21. To succeed in the role, an Enterprise Account Executive is expected to build a strong pipeline of prospects through proactive outreach and self-sourced leads. *Id.*

22. This involves researching the accounts/prospects in their territory, identifying key decision-makers, and initiating contact through methods such as cold calling, email outreach, networking events, and industry conferences. *Id*.

23. An Account Executive must nurture these early-stage relationships by learning about the prospective customer's business challenges and positioning FranConnect's platform as strategically valuable. *Id.*

24. Because Enterprise opportunities rarely come through inbound channels, a significant portion of an Account Executive's success depends on their ability to independently create opportunities, open doors within large organizations, and steadily advance prospects through the Enterprise sales cycle. **Exhibit 2** at 189:12-192:4.

25. Account Executives earn a base salary, commission on their sales, and quarterly bonuses upon meeting their respective sales quota. *Id*; *See* FranConnect-PROD_000646-48 attached as **Exhibit 6**.

26. When Mr. Yates was hired, he was offered an annual base salary of $120,000. *See* FranConnect-PROD_001653 attached as **Exhibit 8**; **Exhibit 4**.

27. On the same day it hired Mr. Yates, FranConnect hired another Account Executive, Michelle Sudan, a nonblack woman, at the same base salary and commission structure. *See* FranConnect-PROD_001633 attached as **Exhibit 7**.

   A.    **Sales Quota**

28. When Mr. Yates was hired, he was given a sales quota that he was expected to meet monthly and quarterly. **Exhibit 6.**

29. Sales quotas are determined by market segment. *See* Deposition of Larissa Levine attached as **Exhibit 8** at 127:14-18

30. Enterprise Account Executives have the highest sales quotas because they pursue the largest franchise customers and sell the largest, most complex deals. **Exhibit 2** at 106:20-108:17; 270:11-18.

31. SMB Account Executives have the lowest sales quotas because they sell to smaller franchises with smaller deal sizes. **Exhibit 2** at 235:3-10; *See also* Deposition of Amy Volatile attached as **Exhibit 9** at 168:7-169:9.

32. Account Executives, who are responsible for securing new clients, are assigned higher sales quotas than Account Managers, who focus on upselling existing enterprise customers. FranConnect-PROD_001545 attached as **Exhibit 10**.

### B.    Ramping Period

33. When Mr. Yates began as an Account Executive, he received a six-month "ramping period" before full performance expectations applied. **Exhibit 6**.

34. During his first three months, he wasn't given a sales quota; in the following three months, he was assigned a lower quota, and after six months, Mr. Yates was required to achieve his full monthly and quarterly quotas. *Id.*

35. During this ramping period, he was also expected to learn FranConnect's products, systems, and sales processes, and begin building his pipeline and customer relationships. *Id.*

### C.    Supervisors and Sales Team

36. When Mr. Yates was hired, he reported to Molly Aiken, VP of Sales, New Logo. **Exhibit 4**.

37. Mr. Yates reported to Ms. Aiken until December 1, 2023, when she left FranConnect. *See* FranConnect-PROD_001562 attached as **Exhibit 11**.

38. Thereafter, Mr. Yates reported to Dan Palay, who was hired in December 2023 as Vice President of Sales. *See* FranConnect-PROD_001734 attached as **Exhibit 12**; *See also* **Exhibit 2** at 75:9-19.

39. Mr. Yates reported to Mr. Palay through the end of his employment. **Exhibit 2** at 88:13-89:13.

40. As VP of Sales, Mr. Palay was responsible for managing the franchise and company owned new-logo sales teams. *Id* at 73:1-21.

41. Mr. Palay supervised a sales team that included Annie Van Pelt, members of the Corporate Owned team, and Ali Muskett who managed the SMB and Mid-Market sales representatives.[1] *Id*; **Exhibit 2** at 75:10-76:4; **Exhibit 9** at 159:12-19.

42. Mr. Palay reported to Austen Asadorian, Chief Revenue Officer, who reported to the CEO. **Exhibit 12**; **Exhibit 2** at 85:8-12.

### D.    Territory Assignment

43. When Mr. Yates was hired, he was assigned a territory that consisted primarily of Enterprise new logo accounts. *See* FranConnect-PROD_001628 attached as **Exhibit 13**.

44. When Mr. Yates was hired, accounts were equitably distributed between him and Ms. Van Pelt allow Mr. Yates and Ms. Van Pelt to focus on developing relationships and generating pipeline within their respective territories. **Exhibit 8** at 87:14-88:4.

45. When allocating territories among sales representatives, FranConnect's sales leaders evaluate a range of factors to ensure each territory is balanced and equitable. *Id*. at 77:12-81:1; 84:11-86:11.

---

[1] While Michelle Sudan was hired as an Enterprise Account Executive, the sales leaders later transitioned her to a Mid-Market role due to her inability to grasp the complexity of deals. Ms. Sudan was eventually terminated due to performance related issues. **Exhibit 11**

46. One consideration is whether an account has "purchasing authority," meaning that the customer's executives can directly authorize the purchase of the FranConnect platform. *Id.*

47. If an account lacks purchasing authority, purchasing decisions are generally made by a parent company. *Id.*

### E. Annual Territory Reassignment

48. FranConnect reassigns the accounts of all Account Executives and Managers at the beginning of every calendar year to ensure they have balanced territories and address any accounts that may achieve better success with another sales representative. *See* FranConnect-PROD_001712 attached as **Exhibit 14**.

49. FranConnect updates territories annually based on the latest market data to ensure equitable assignments for all Account Executives. **Exhibit 3** at 2; **Exhibit 8** at 35:21-36:7.

50. Larissa Levine, Vice President of Revenue Operations, managed the account reassignment process during Mr. Yates's employment at FranConnect. **Exhibit 8** at 28:16-29:19.

51. Ms. Levine testified that before any accounts were reassigned, FranConnect allowed each Account Executive to "protect" certain accounts in their territory. *Id.* at 133:6-136:17.

52. During the reassignment period at the start of 2024, Mr. Yates and Ms. Van Pelt were offered the opportunity to protect 50 accounts each. *Id.*

53. Mr. Yates requested protection for 44 accounts and Ms. Van Pelt did the same. *Id.*

54. Any account not marked as "protected" or with an "active opportunity" was eligible for reassignment. *Id.*

55. At the end of the account reassignment process in January 2024, Ms. Van Pelt had 167 accounts with purchasing power, and Mr. Yates had 163. *Id.* at 86:16-89:10

**F.      Mr. Yates's Performance in FY2023**

56. After completing his ramping period in August 2023, Mr. Yates was expected to meet his monthly sales quota of $13,000/month. *See* FranConnect-PROD_002218 attached as **Exhibit 16; Exhibit 6**.

57. By the end of 2023, Mr. Yates had only achieved 54.8% of his annual quota. FranConnect-PROD_001566 attached as **Exhibit 17**.

58. The only quarter Plaintiff achieved his sales quota was Q4 2023 when he hit 254% of his monthly sales quota in October 2023 and hit 119% of his sales quota for Q4 2023. **Exhibit 16**.

59. This was the first and last time Mr. Yates achieved his FranConnect quarterly sales quota. *Id.*

60. In his 2023 Annual Performance Review, Ms. Aiken noted that Mr. Yates had "[i]nsufficient pipeline generation" which "resulted in lack of opportunities throughout the year." **Exhibit 17**.

61. She also noted that he struggled with "generating self source[d] outbound opportunities." *Id.*

62. In addition to meeting quota, FranConnect considers pipeline generation another key performance indicator ("KPI") for all sales representatives as it reflects thier ability to create future revenue opportunities and sustain consistent sales activity. **Exhibit 2** at 111:3-21.

63. A strong pipeline demonstrates proactive outreach and effective prospecting through the sales cycle. *Id.* at 138:15-139:4.

64. Without sufficient pipeline, a sales representative cannot reliably meet quotas or drive long growth. *Id.*

**G.      Yates Inherits Van Pelt's Accounts**

65. In February 2024, Ms. Van Pelt resigned from her employment at FranConnect. *See* FranConnect-PROD_000628.

9

66. At the time she resigned, Ms. Van Pelt had a total of 285 accounts in her territory – 167 of which had purchasing power. **Exhibit 15**.

67. Ms. Van Pelt also had nine active opportunities in her pipeline when she resigned. FranConnect-PROD_002205-07 attached as **Exhibit 19**.

68. Before she left, Ms. Van Pelt ranked the nine active opportunities in her pipeline. *Id.*

69. Mr. Palay assigned Mr. Yates the four largest opportunities that Ms. Van Pelt identified as 'tier one' opportunities. *Id.*; **Exhibit 2** at 205:18-206:3.

70. This resulted in an increase of $80,000 to Mr. Yates' pipeline, which allowed him to exceed his monthly pipeline target of $40,000 for February and March 2024. **Exhibit 2**. at 205:18-206:3.

71. Mr. Yates also benefited from Ms. Van Pelt's departure, as he was allowed to cherry pick accounts from Ms. Van Pelt's territory, yielding him 28 new accounts with purchasing power. **Exhibit 15**; *see also* FranConnect-PROD_000639 attached as **Exhibit 20**

### H.      FranConnect Hires Amanda Griffin as an Enterprise Account Executive

72. In April 2024, FranConnect hired Amanda "AJ" Griffin as an Enterprise Account Executive to replace Ms. Van Pelt. *See* FranConnect-PROD_000330-31 attached as **Exhibit 21**.

73. Mr. Yates and Ms. Griffin were the only Enterprise Account Executives employed by FranConnect at the time. **Exhibit 7**.

74. When Ms. Griffin was hired, her territory had 161 accounts, 88 of which had purchasing power. **Exhibit 15**.

75. Mr. Yates had 259 accounts in his territory at the time, and 182 of those accounts had purchasing power. *Id*.

76. This imbalance was because Ms. Griffin inherited Ms. Van Pelt's accounts not claimed by Mr. Yates and others. **Exhibit 2** at 205:18-207:8; **Exhibit 14** at 87:21-89:10, 145:11-147:14.

### I.      Mr. Yates's Performance in 1Q/2Q 2024

77. In January 2024, Mr. Yates achieved 0% of his monthly sales quota. **Exhibit 16**.]

78. In February 2024, he achieved 54% of his monthly sales quota by selling a "step-up" deal. *See* FranConnect-PROD_001659 attached as **Exhibit 22**.

79. A step-up deal is a pricing arrangement where the customer's financial commitment increases over time in predefined steps rather than all at once like a new logo deal. **Exhibit 16; Exhibit 2** at 341:2-18.

80. In March 2024, Ms. Yates achieved 0% of his sales quota and ended the first quarter of 2024 with an 18% quota attainment and zero new logo customers. **Exhibit 16**.

81. In April 2024, despite then having the most accounts with purchasing power, Mr. Yates failed to make any sales and only achieved 4% of his monthly quota attainment in May 2024. *Id.*

82. Similar to the deal he closed in March 2024 deal, Mr. Yates closed one "step-up" deal in May 2024 that achieved 4% of his sales quota. **Exhibit 22**.

83. By June 2024, Mr. Yates had attained 60% of his monthly sales quota based on two "upsell" deals he closed with existing customers. *Id*; **Exhibit 16**.

84. Mr. Yates finished Q2 2024 with 23% quota attainment and zero new logo customers. *Id.*

### J.      Performance Improvement Plan ("PIP")

85. Based on his failure to meet his sales quota for the first two quarters of the year, on June 10, 2024, Mr. Yates was placed on a 60-day Performance Improvement Plan ("PIP"). **Exhibit 5**.

86. FranConnect's PIP policy provides that the sales managers evaluate the performance of the sales team on a 3-to-6 month rolling look-back period and 75% of consistent goal attainment is required to remain in good standing. *Id.*

11

87. Moreover, attainment levels that consistently fall below 70% of goal warrant additional adverse performance actions. *Id.*

88. When he was placed on a PIP, Mr. Yates had only hit 11.5% of his year-to-date quota, had less than 33% pipeline, and had not closed a new logo deal in the first six months of the year. *Id.*

89. The PIP required Mr. Yates to attain at least 50% of his sales quota for two consecutive months, close a new logo opportunity, generate four new logo opportunities in his pipeline, be present in the office once per week, maintain Salesforce hygiene, and send weekly email updates summarizing his progress towards his PIP. *Id.*

### K.    Performance While on a PIP

90. In the first full month following being placed on the PIP, Mr. Yates only attained 10% of his monthly sales quota. **Exhibit 16**; **Exhibit 22**.

91. In August 2024, Mr. Yates achieved 104% of his monthly quota. **Exhibit 16**.

92. The deal Mr. Yates closed in August 2024 resulted from an existing client's subsidiary company purchasing FranConnect software. **Exhibit 2** at 301:4-302:6, 326:6-12.

93. As such, the deal was not self-sourced by Mr. Yates, and due to the circumstances surrounding its closure, there was uncertainty regarding the potential for him to replicate its success. *Id.*

### L.    PIP is Extended

94. As a result of his lack of consistency in meeting his sales quota, Mr. Yates's PIP was extended until September 30, 2024. FranConnect-PROD_001672 attached as **Exhibit 23**.

95. Upon being informed his PIP would be extended, Mr. Yates responded "I have acknowledged and understand." *Id.*

12

96. Although Mr. Yates had achieved some success in the prior month, Mr. Palay decided to extend Mr. Yates's PIP to assess whether his progress would be sustainable over time. **Exhibit 2** at 327:19-328:1, 329:20-331:2, 362:16-364:13.

97. It was not uncommon for FranConnect to extend the PIP of an Account Executive struggling to meet their performance expectations. *Id.* at 305:7-306:2; **Exhibit 11**.

98. One of those employees included Barrett Scully, a non-black SMB Account Executive who had his PIP extended, despite Mr. Scully meeting 97% of his quota while on PIP and having significant pipeline. *See* FranConnect-PROD_002092 attached as **Exhibit 24**.

99. Notably, Mr. Scully's employment was terminated after he failed to meet the goals of the second PIP despite achieving the first one. **Exhibit 11**.

100.    Mr. Yates's extended PIP required him to achieve 50% of his Q3 quota, close one new logo opportunity, generate four new logo opportunities in his pipeline, maintain Salesforce hygiene, send a weekly email summarizing progress, and display consistent performance. **Exhibit 23**.

101.    By the end of the second PIP period, Mr. Yates had only attained 11% of his September sales quota. **Exhibit 16**.

102.    The one deal that Mr. Yates closed in September was a customer that renewed its contract with FranConnect, not a new logo deal. **Exhibit 22**.

103.    Notably, Mr. Yates ended the third quarter of 2024 with 42% quota attainment and had not self-sourced a new logo deal all year. *Id.*

### M.    PIP is Extended Again

104.    On or about October 1, 2024, Mr. Palay and Mr. Asadorian met with Mr. Yates to discuss his PIP. FranConnect-PROD_001670 attached as **Exhibit 25**.

13

105. Despite falling well short of his quota and new logo goals, Mr. Palay and Mr. Asadorian decided to extend Mr. Yates's PIP again to give him an additional opportunity to show sustained improvement in meeting his sales quota. *Id.*

106. The extended PIP required Mr. Yates to meet 75% of his sales quota and generate $100,000 in new pipeline with $50,000 attached to new logo, self-sourced opportunities. *Id.*

107. Mr. Yates once again failed to meet expectations. By the end of October 2024, he had attained 19% of his monthly sales quota and failed to close any new logo deals. **Exhibit 22**.

108. Mr. Yates made no sales in November 2024, and in December 2024, he achieved 64% of his monthly sales quota by closing a step-up deal and renewal deal. *Id.*

109. Mr. Yates ended Q4 2024 with a 27% quota attainment with no new logo deals closed. *Id.*

### N.    Complaint of Unfair Treatment

110. On December 2, 2024, Mr. Yates sent an email to FranConnect's Senior Vice President of People, Stephanie Opoku, alleging that he was being discriminated against by Mr. Palay and Mr. Asadorian because of his race. *See* FranConnect-PROD_001550 attached as **Exhibit 26.**

111. Mr. Yates claimed that he was unfairly treated because of his race during the account reassignment process at the beginning of the 2024 and for being placed on a PIP. *Id.*

112. Ms. Opoku met with Mr. Yates a few days later to investigate his allegations Mr. Yates to provide as many specific details as possible, including account names, context of verbal conversations had, and any written documentation to support his claim. *Id.*

113. On December 11, 2024, Ms. Opoku met with Mr. Palay to understand his perspective related to the account reassignments. *Id.*

14

114. After reviewing all of the relevant evidence, Ms. Opoku concluded that Mr. Yates allegations "did not contain any explicit or implicit reference to race or contain any indications of racial discrimination." *Id.*

### O. Offer to Transition to Account Manager Role or Be Terminated

115. By the end of 2024, Mr. Yates had attained 27.6% of his sales quota for the entire year and failed to meet the performance expectations outlined in his PIP. **Exhibit 22**.

116. In lieu of terminating his employment, FranConnect offered Mr. Yates the opportunity to transition from an Enterprise Account Executive to an Enterprise Account Manager role, where he would focus on upselling existing clients, which he had success with in the past. FranConnect-PROD_000027-28 attached as **Exhibit 27**.

117. 10 of the 11 deals Mr. Yates closed in 2024 were upsells, renewals, or step-up transactions, the very types of deals handled by Enterprise Account Managers. **Exhibit 22**.

118. FranConnect regularly transitions sales representatives to new roles when their skills align better with alternative positions. *See* **Exhibit 9** at 27:3-16; *See* Deposition of Stephanie Opoku Vol. 1 attached as **Exhibit 28** at 106:13-107:6; *see* Deposition of Stephanie Opoku Vol. 2 attached as **Exhibit 29** at 249:3-14.

119. When Mr. Yates was offered the role of Enterprise Account Manager, he was told that his salary and commission structure would remain the same, and that he would report to a manager other than Mr. Palay. **Exhibit 27**.

120. Mr. Yates also was told that if he accepted the lateral position, he would be removed from the PIP and start with a clean slate. *Id.*

121. Mr. Yates refused the transition, claiming that it was a demotion. *See* FranConnect-PROD_000110-11 attached as **Exhibit 30**.

122.    FranConnect terminated Mr. Yates's employment on January 13, 2025. *Id.*

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate if the record demonstrates "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations and citations omitted); *see also Road King Development, Inc. v. JTH Tax LLC*, 657 F.Supp.3d 780, 789 (E.D. Va. 2023). Once this burden has been met, the non-moving party "must offer more than unsupported speculation to withstand summary judgment." *Road King Development, Inc.*, 657 F.Supp.3d at 789.

Although the Court must view the facts and the inferences drawn therefrom in the light most favorable to the non-moving party, a plaintiff's self-serving and conclusory allegations, unsupported by affidavits, depositions transcripts, or specific exhibits are insufficient to prevent summary judgment. *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998). Where the opposing party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment should be entered in favor of the moving party. *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001) (quoting *Celotex Corp.*, 477 U.S. at 322).

16

## ARGUMENT

### IV.    MR. YATES FAILS TO MEET HIS BURDEN THAT HE WAS DISCRIMINATED AGAINST BASED ON RACE

Because Mr. Yates lacks any direct evidence of discrimination, his claims under Title VII, § 1981, and the VHRA must be analyzed under the *McDonnell Douglas* pretext framework. *Johnson v. United Parcel Serv., Inc.*, 839 F. App'x 781, 783 (4th Cir. 2021) (citing *Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 717 (4th Cir. 2013)).[2] Thus, to establish a *prima facie* case for race discrimination using the *McDonnell Douglas* framework, Mr. Yates must prove that (1) he is a member in a protected class; (2) his job performance was satisfactory; (3) he suffered an adverse employment action; and (4) similarly situated employees outside of the protected class were treated differently. *Goode v. Cent. Virginia Legal Aid Soc'y, Inc.*, 807 F.3d 619 (4th Cir. 2015) (citation omitted). If he satisfies this burden, FranConnect must articulate a legitimate nondiscriminatory reason for its actions, and then Mr. Yates has the burden of proving FranConnect's reason was pretextual. *Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 719 (4th Cir. 2013) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973)). Although there is no dispute that Mr. Yates is a member of a protected class and suffered an adverse employment action when his employment was terminated, he cannot prove that his job performance was satisfactory or that he was treated differently than similarly situated employees outside of his protected class.

---

[2] Claims for discrimination under Title VII, § 1981 and the Virginia Human Rights Act ("VHRA") are analyzed together under the Title VII framework. *See e.g.*, *Washington v. Offender Aid & Restoration of Charlottesville-Albemarle, Inc.*, 677 F. Supp. 3d 383, 396 n.4 (W.D. Va. 2023) ("Because Title VII and the VHRA use substantially identical language, the Court analyzes [plaintiff's] Title VII and VHRA claims together.").

**A.    Mr. Yates's Performance as an Enterprise Account Executive Was Unsatisfactory**

When assessing whether a plaintiff was performing his job satisfactorily, it is the employer's perception, not the employee's own view of his performance, that is determinative. As the Fourth Circuit has made clear, "[i]t is the perception of the decision maker which is relevant,' not the self-assessment of the plaintiff." *Smith v. Flax*, 618 F.2d 1062 (4th Cir. 1980). Likewise, the opinions of coworkers add little to this analysis, as their view "is close to irrelevant." *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 235 (4th Cir.1991) (footnote omitted).

Here, the record is undisputed and unequivocal that Mr. Yates failed to satisfy FranConnect's legitimate performance expectations throughout his employment. After his six-month ramping period ended in August 2023, Mr. Yates achieved only 54.8% of his annual quota in 2023; in 2024, he repeatedly failed to generate sufficient pipeline, closed no self-sourced new-logo deals, and met his monthly quota only once in twelve months, despite inheriting substantial accounts, receiving additional pipeline, and being given multiple extended opportunities to improve. His supervisors consistently documented these deficiencies, and the objective performance metrics, like pipeline, quota attainment, and new-logo generation, leave no room for dispute regarding his lack of satisfactory performance.

Mr. Yates's assertion that he "finished 2024 as the #3 top-performing sales representative overall … with $43,000 in closed deals" is fundamentally misplaced. Amended Complaint ¶¶ 24, 57 attached as **Exhibit 31.** His claim relies entirely on his own calculation of raw annual recurring revenue ("ARR") dollars generated. But Account Executives at FranConnect are *not* evaluated based on total ARR or the face value of deals they close. As the undisputed evidence confirms, Account Executives are measured on **quota attainment**, not on raw revenue. *See* **Exhibit 2** at 338:11–339:14. On that metric, which is the metric FranConnect actually uses to assess

18

performance, Mr. Yates ranked among the lowest performers in 2024. *See* FranConnect-PROD_002203 attached as **Exhibit 32**.

> **B.      Mr. Yates Has Not Identified Any Similarly-Situated Account Executives Who Were Treated Differently Than Him**

With regard to identifying similarly situated employees outside of the plaintiff's protected class who were treated differently, the Fourth Circuit has emphasized that "[t]ypically, a comparator and the plaintiff have 'dealt with the same supervisor, were subject to the same standards[,] and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Gary v. Facebook, Inc.*, 822 F. App'x 175, 181 (4th Cir. 2020) (quoting *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223–24 (cleaned up))." "Generalized similarity is not enough to survive a motion for summary judgment because jobs with similar titles and "only vaguely corresponding responsibilities" are not similarly situated. *Chapman v. Wal-Mart, Inc.*, No. 5:20CV00105, 2021 WL 2379810 (W.D. Va. June 10, 2021) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992))." "[I]n the Title VII context, isolated incidents or random comparisons demonstrating disparities in treatment may be insufficient to draw a prima facie inference of discrimination without additional evidence that the alleged phenomenon of inequality also exists with respect to the entire relevant group of employees. *See Cook v. CSX Transportation Corp.*, 988 F.2d 507, 511–512 (4th Cir.1993)." (206-207).

In his Amended Complaint, Mr. Yates alleges that, as "the only African American on his team, [he] was treated demonstrably worse than his white comparators, Amy Volatile, Jessy McGarry and Amanda Griffin." **Exhibit 31** at ¶ 90. But neither Ms. Volatile nor Ms. McGarry were similarly situated to Mr. Yates. Both were Mid-Market Account Executives with different

19

territories, deal strategies, quotas, and significantly shorter sales cycles. **Exhibit 7**. They also did not report to the same manager as Mr. Yates. **Exhibit 9** at 108:19-109:3.

As to Ms. Griffin, Mr. Yates claims she received favorable treatment because she was not placed on a PIP despite not making a sale by April 2024, she was given preferential treatment during the reassignment process, and she was permitted to "poach" his accounts. **Exhibit 31** at ¶ 44, 46. These allegations are unfounded, and the undisputed evidence shows she was treated no differently than Mr. Yates. Like Mr. Yates, Ms. Griffin received a six-month ramping period when she started in April 2024, lasting through October 2024. **Exhibit 9** 147:2-14. Notably, her ramping period ended when Mr. Yates was on the third extension of his PIP and had already served nearly 19 months as an Account Executive. **Exhibit 25**. Thus, Mr. Yates's assertion that "Griffin still had not made a single sale as of April 2024" is misleading; she had just begun her ramping period and, like Mr. Yates during his own ramping period, did not yet carry monthly quota. **Exhibit 31** ¶ 46. Moreover, Ms. Griffin made her first sale in January 2025 – her eighth month at FranConnect. FranConnect-PROD_002219 is attached as **Exhibit 33**. Mr. Yates likewise made his first sale in the eighth month of his employment, in October 2023. **Exhibit 16**. But by January 2025, Mr. Yates had been with FranConnect for 23 months and was long past any ramping period, and subject to full expectations and quotas. Comparing Ms. Griffin's performance during her ramping period to Plaintiff's performance nearly two years into his tenure is not an apples-to-apples comparison; the expectations, quotas, and evaluation criteria were fundamentally different, particularly given that Ms. Griffin was assigned an "unequitable" territory. See supra Section vi.

Mr. Yates's claim that he "was the only sales representative who had… his accounts removed out of his team of 13 sales peers" is also contradicted by the undisputed record. **Exhibit 31** at ¶ 31. All Account Executives had accounts reassigned at the start of each fiscal year and

20

upon the hiring of a new sales representative. **Exhibit 8** at 144:22-147:14; **Exhibit 9** at 169:16-172:14. The evidence further establishes that Mr. Yates benefited from account reassignments more than Ms. Griffin. **Exhibit 11**. Collectively, the record demonstrates that the account reassignment process was applied uniformly and without favoritism.

Another critical distinction between Mr. Yates and Ms. Griffin, Ms. Volatile, and Ms. McGarry that makes them improper comparators is that none of them exhibited the performance deficiencies Mr. Yates did. **Exhibit 16**. Unlike Mr. Yates, their key performance indicators, including consistently developing a robust pipeline of self-sourced deals, showed steady progress and a clear likelihood of success in their roles. *Id.* In 2024, Mr. Yates self-sourced only one $6,000 deal. *Id.* By contrast, Ms. Griffin self-sourced eight deals totaling $98,000 in 2024, despite spending much of the year in ramp-up and working a weak, fragmented territory. *Id.* During this same period, Ms. Volatile and Ms. McGarry self-sourced fourteen deals for $46,000 and nine deals for $30,000, respectively; notably, Ms. Volatile did so while transitioning to a new team mid-year and completing a corresponding ramp-up period. **Exhibit 9** at 27:8-16. Moreover, Ms. Volatile closed four new logo deals and M.s McGarry closed five new logo deals in Q4 2024 alone. **Exhibit 33**. Mr. Yates closed zero new logo deals during that period. *Id.* Ms. McGarry exceeded expectations, finishing FY2024 at 121% of quota. *Id.* These metrics demonstrate that Mr. Yates's performance lagged significantly behind that of his proposed comparators. *Id.*

Mr. Yates's weak performance relative to Ms. Volatile, Ms. Griffin, and Ms. McGarry was also predictable given his lack of engagement in self-sourcing opportunities. Unlike the comparators, he did not consistently contact accounts in his territory. From June to December 2024, he made only 254 outbound calls, compared to Ms. Griffin's 4,058. *Id.* Similarly, in Q4 2024, Mr. Yates booked just 20 customer meetings (56% attainment), while Ms. Griffin booked 48

21

(133%), Ms. Volatile booked 69 (192%), and Ms. McGarry booked 77 (214%). *Id.* During that same quarter, he achieved only 27% of his sales quota, compared to 73% for Ms. Volatile and 156% for Ms. McGarry. *Id.* These substantial, consistent disparities confirm that Mr. Yates's performance issues were unique and not comparable to those of the other sales representatives.

**C.    FranConnect Has Articulated a Legitimate Non-Discriminatory Reason for Placing Mr. Yates on a PIP**

Mr. Yates's claim that the PIP policy was "subjectively enforced to [his] disadvantage," suffers from the same infirmities as his other allegations – namely that he cannot demonstrate that he was performing his job satisfactory, or that similarly-situated comparators were treated more favorably them him. However, even if Mr. Yates had any evidence to establish these elements of his prima facie claim of discrimination, FranConnect has articulated legitimate, nondiscriminatory reasons for placing him on a PIP and later terminating his employment, namely his objectively poor performance as an Enterprise Account Executive.

When an employer articulates legitimate, nondiscriminatory reasons for an adverse employment action the plaintiff must prove by a preponderance of evidence that the legitimate reasons offered by the employer were not its true reasons. *Gomez v. Haystax Technology, Inc.*, 292 F.Supp. 3d 676 (2017). However, Mr. Yates has no such evidence. Mr. Yates also has no evidence to rebut that FranConnect placed other sales representatives outside of his protected class on PIPs as well. **Exhibit 11**. For example, when Mid-Market Account Executive Charlie Edwards (white male) achieved only 16% of his year-to-date quota attainment, Mr. Palay put him on a PIP and later terminated him. *See* FranConnect-PROD_002080 attached as **Exhibit 34**. Mr. Palay also put Mid-Market Account Executive Adam Engle (white male) on a PIP and later terminated him immediately after his ramping period due to a low quota, low pipeline and low meeting activity.

*See* FranConnect-PROD_002138 attached as **Exhibit 35**. Part of Mr. Engle's PIP was requiring him to be present in office 3 times per week. *Id.*

Mr. Yates further claims that Ms. Volatile as an example of a sales representative with "significantly lower sales" who was not placed on a PIP. **Exhibit 31** at ¶ 59. Although Ms. Volatile may have initially had less sales than Mr. Yates in 2024, she exceeded his sales for Q4 2024 upon coming off of her ramping period. **Exhibit 33**. Moreover, the circumstances of Ms. Volatile's initial struggle to land a deal differed significantly from Mr. Yates. Indeed, at the start of 2024, Ms. Volatile was a member of the Corporate-Owned team until March 2024 when she transitioned to the Mid-Market Account Executive role. **Exhibit 2** at 343:14-18; **Exhibit 28** at 106:7-107:6. Upon transitioning teams, Ms. Volatile was given a new ramping period to learn the new market until September 2024. *Id.* Thus, in August 2024, Ms. Volatile, like Mr. Yates, was not held to the full performance standards during her ramping period, when her primary focus was building client relationships and developing her pipeline.

### D.    Mr. Yates Was Compensated Fairly and Equitably

In his Amended Complaint, Mr. Yates claims that he was paid less than his white counterparts. **Exhibit 31** at ¶ 54. In support of his claim, Mr. Yates alleges that "[d]uring a dinner…in Atlanta on June 18, 2024, two of Yates' white colleagues—Andrew Masterson and Amanda Griffin, both Enterprise Account Managers—mentioned that they were earning significantly more base salary than he was in the same role." *Id.*

FranConnect determines an employee's starting salary based on the individual's prior experience with the role they are being hired for, business need, and market conditions. *See* Answers to Interrogatories No. 20. When Mr. Yates was hired by FranConnect, he had no prior experience selling new logo Enterprise accounts. *See* Deposition of James Yates Attached as

23

**Exhibit 36** at 314:15- 315:5. Mr. Yates also had only seven years of sales experience and had no management experience. FranConnect-PROD_001649 is attached as **Exhibit 37**. Mr. Yates was offered a starting salary of $120,000, which was within the salary range he requested during the interview process. **Exhibit 7**; FranConnect-PROD_002172 attached as **Exhibit 38**. Michelle Sudan, who was hired on the same day and for the same position as Mr. Yates, was offered the same base salary based on her similar prior experience. **Exhibit 29** at 243:13-244:20.

When hired, Ms. Griffin was offered a starting base salary of $135,000. **Exhibit 7**. Ms. Griffin had eleven years of sales experience, as well as prior experience in Enterprise sales and working with SaaS platforms, unlike Mr. Yates. *See* FranConnect-PROD_002266-67 attached as **Exhibit 39**. Ms. Griffin also managed a team of sales representatives at her previous employer. *Id.*; **Exhibit 29** at 276:22-278:18. With regard to Mr. Masterson, he held a different position than Mr. Yates – an Enterprise Account Manager – the exact position Mr. Yates declined. **Exhibit 7**. Mr. Masterson is also not a similarly situated comparator because he had a different role, supervisor, and focused on upselling current clients rather than acquiring new business. *Id.*

### E. Mr. Yates's Remaining Allegations of Discrimination are Not Actionable

Mr. Yates's remaining allegations – that he was excluded from a Phoenix Brands sales meeting, that Mr. Asadorian purportedly made vague comments about the franchising community being an "exclusive group," and that the remote-work policy was "subjectively enforced" – fail as a matter of law because none constitutes an adverse employment action, nor do they plausibly show discriminatory intent. His "exclusion" from the Phoenix Brands meeting did not alter the terms or conditions of his employment; the meeting was scheduled at the executive level using a standard "bridging" technique regularly employed at FranConnect, and sales representatives are commonly not included on such calls. **Exhibit 2** at 291:9-292:5; 293:5-300:6. The deal closed, and

Mr. Yates received full commission, confirming no material harm resulted. *Id.* His allegation that Mr. Palay stated FranConnect would "present better" without him lacks evidentiary support and any connection to Mr. Yates's race.

Likewise, the alleged comments by Mr. Asadorian are not actionable. Both Mr. Asadorian and Mr. Palay deny the statements were made, and Mr. Yates offers no evidence that any such remarks were racially motivated. **Exhibit 36** at 323:2-324:3; **Exhibit 2** at 137:7-18. The franchising community's "exclusive" nature is driven by industry dynamics, not race—confirmed by Amy Volatile, who also felt like an outsider despite being white. **Exhibit 9** at 173:8-174:11.

Finally, Mr. Yates's challenge to the remote-work policy also fails. FranConnect employs both remote and in-person staff, and Mr. Yates was hired as an in-person employee. **Exhibit 29** at 235:13-236:2; **Exhibit 28** at 57:4-14. When the policy was updated effective January 1, 2024, his requirement to work in-office one day per week was based solely on his distance from the office – an undisputed, race-neutral criterion. FranConnect-PROD_002158 attached as **Exhibit 40**; **Exhibit 29** ¶ 65; **Exhibit 5**. His comparators were not similarly situated: Ms. McGarry had a medical accommodation, and Mr. Chapman was hired as a remote employee. **Exhibit 28** at 72:19-75:10; **Exhibit 7**. Because none of these allegations materially affected his employment and each is explained by legitimate, nondiscriminatory business reasons that Mr. Yates cannot rebut, they cannot support a discrimination claim.

## V.   MR. YATES FAILS TO MEET HIS BURDEN THAT HE WAS RETALIATED AGAINST BY FRANCONNECT

To state a prima facie case of retaliation, Mr. Yates must prove: (1) he engaged in a protected activity; (2) FranConnect took an adverse employment action against him; and (3) there

is causal link between the two events.[3] *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015). If Mr. Yates satisfies this burden, FranConnect must proffer a legitimate, non-retaliatory justification for the adverse employment action. *Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 719 (4th Cir. 2013) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973)). The burden is then back on Mr. Yates to demonstrate that the non-retaliatory reason advanced by FranConnect is a mere pretext by establishing "both that the [employer's] reason was false and that [retaliation] was the real reason for the challenged conduct." *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir.1995) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). Unlike discrimination claims, retaliation claims under both Title VII and § 1981 require a plaintiff to prove "but-for" causation. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013); *see also Johnson v. United Parcel Serv., Inc.*, 839 F. App'x 781, 783 (4th Cir. 2021).

In his Amended Complaint, Mr. Yates alleges that FranConnect retaliated against him based on his protected activity when it "(1) proposed to demote him despite his more favorable sales results compared to his non-Black peers; (2) unlawfully fired Yates on January 13, 2025 and not his lesser performing non-Black peers, the same day that he engaged in protected activity yet again; (3) unlawfully denied Yates his commissions; and (4) both paid Yates late and shorted him on his last paycheck."

---

[3] Courts in this Circuit have applied the *McDonnell Douglas* framework to claims under Virginia's Fraud and Abuse Whistle Blower Protection Act., Va. Code Ann. § 2.2-3011, and suggest that it can be applied to state whistleblower statutes. *Washington v. Offender Aid & Restoration of Charlottesville-Albemarle, Inc.*, 677 F. Supp. 3d 383, 398 (W.D. Va. 2023) ("Courts 'routinely apply [the *McDonnel Douglas*] framework in adjudicating claims brought under similar state and federal whistleblower statutes.'"); *see also Buck v. Modine Mfg. Co.*, 776 F.Supp.3d 357 (W.D. Va. 2025) (applying the same burden shifting framework but without citing directly to *McDonnell Douglas*).

26

### A.    The Offer to Transition Yates to a New Position Was Not Retaliatory

Mr. Yates's claim that FranConnect retaliated against him by offering to transition him to an Account Manager role – after his demonstrated failure to close new-logo deals – fails because he cannot show that the offer constituted a materially adverse reassignment. A reassignment is only actionable if it has a "significant detrimental effect." *Williams v. Newport News Sch. Bd.*, No. 4:20-CV-41, 2021 WL 3674983, at *15 (E.D. Va. Aug. 19, 2021). Courts assessing material adversity consider whether the change involved reduced compensation, diminished responsibilities, or a lower status or career trajectory. *Id.* There is no dispute that none of these factors is present here. The offer to transition Mr. Yates to the Account Manager role would not have changed his base salary, benefits, or any other term or condition of employment. **Exhibit 28** at 272:15–273:2; see **Exhibit 31 ¶** 79 ("same base salary"). His core responsibility of selling FranConnect products would remain intact, and he would retain most of his existing new-logo pipeline. **Exhibit 2** at 172:19–173:6; **Exhibit 26**.

Moreover, far from being detrimental, the Account Manager position aligned with Mr. Yates's demonstrated strengths and offered a greater likelihood of financial success. Ten of the eleven deals he closed in 2024 were upsells, renewals, or step-up transactions – the very work Account Managers perform. **Exhibit 3**; **Exhibit 28** at 78:14–19; **Exhibit 29** at 272:15–273:2; **Exhibit 2** at 172:19–173:6]. The proposed transition thus presented a lateral move with a higher probability of earning commissions, not a demotion. No reasonable employee would be dissuaded from engaging in protected activity by an offer to move into a role with the same compensation, same responsibilities, same promotional path, and a better chance of success. As such, Mr. Yates cannot establish that the offer was materially adverse.

**B.**    **Mr. Yates Cannot Establish that The Offer to Transition to an Account Manager Role or The Subsequent Termination of His Employment Was Because of His EEO Complaints**

Mr. Yates also has failed to establish causation between the offer to transition him to an Account Manager role (or FranConnect's decision to terminate his employment after he turned down the position) and his internal complaint or EEOC charge. While a plaintiff may rely on temporal proximity to raise an inference of causation, such an inference is doubted when there is evidence of actions leading to the employee's probation or termination before they engaged in protected activity. *See Imungi v. Virginia Commonwealth Univ.*, No. 23-1648, 2025 WL 2612761, at *4 (4th Cir. Sept. 10, 2025); *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) ("The actions that led to [the plaintiff's] probation and termination began before her protected activity, belying the conclusion that a reasonable factfinder might find that [the defendant's] activity was motivated by [her] [protected] complaints."). Thus, "[e]mployers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001). Further, causation is not established when "the record is clear that [the plaintiff] was terminated because of his poor performance, rather than because he complained of discrimination." *Shun-Lung Chao v. Int'l Bus. Machines Corp.*, 424 F. App'x 259, 261 (4th Cir. 2011); *see also Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 721 (4th. Cir. 2013). (finding that the plaintiff's repeated violations of company policy was a legitimate, non-retaliatory reason for the adverse employment action despite the temporal proximity of the plaintiff's complaint).

No causal connection exists here because FranConnect's decision to laterally transfer Mr. Yates a similar role was contemplated long before Mr. Yates engaged in any alleged protected

28

activity. Specifically, there is no dispute that "Austen, Dan, and our Senior Director of Account Management, Phil Chang, had already started having discussions about possibly moving Chris from Dan's team to the Account Management team, where the sales leaders felt his skills might be more aligned. These conversations had started well before Chris submitted his claim." *See* **Exhibit 26**. There also can be no dispute that FranConnect's decision to terminate Mr. Yates's employment should he turn down the Account Manager position was based solely on his documented performance issues. Indeed, well before Mr. Yates made his internal complaint or filed his charge of discrimination with the EEOC, he knew that his failure to satisfy the terms of his PIPs would result in termination of his employment. **Exhibit 2** at 253:5-8, 263:16-264:17; **Exhibit 5**; **Exhibit 25**; **Exhibit 23**. Indeed, FranConnect's discussions regarding the decision to offer Mr. Yates the option to accept the lateral or be terminated "were respective to Chris's performance improvement plan. There was no basis for the claim factored into our decision, and we can't not make business decisions and follow our process because there was a claim." **Exhibit 28** at 147:7-11.

      **C.**      **Mr. Yates's Commission and Paycheck Claims Fail Because Phoenix Brands Defaulted and No Commissions Were Earned**

Finally, Mr. Yates's allegation that FranConnect denied him commissions and deliberately paid him late and shorted his final paycheck in retaliation for his complaints and EEOC charge is unsupported by the record and fails as a matter of law. The only commissions at issue relate to the Phoenix Brands deal – an agreement that never resulted in payment to FranConnect because Phoenix Brands failed to perform and ultimately defaulted on its contractual obligations. Mr. Yates was fully aware of Phoenix Brands's failure to pay. *See* FranConnect-PROD_002173 attached as **Exhibit 41**. *See, e.g.,* **Exhibit 42** (Yates emailing Phoenix Brands about its outstanding balance of $69,956.67; **Exhibit 43** (Yates copied on an email from a FranConnect Accounts Receivable Manager to Phoenix Brands informing them of an outstanding balance of $71,338.67); **Exhibit 44**

29

(Yates copied on an email from a FranConnect to Phoenix Brands informing them of a "seriously past due" bill); **Exhibit 45** (Yates copied on an email from a FranConnect discussing suspending Phoenix Brands from accessing FranConnect's platforms). Under FranConnect's commission policy, commissions are contingent on the successful completion of a sale and receipt of payment from the customer. **Exhibit 46**. Where, as here, a customer defaults and the sale is not completed, FranConnect reserved the right to withhold or reclaim commissions. Accordingly, Mr. Yates was never entitled to the Phoenix Brands commissions in the first place, and their nonpayment cannot constitute retaliatory conduct.

Equally unavailing is Mr. Yates's claim that his final paycheck was paid late or shorted for retaliatory reasons. The undisputed evidence shows that any perceived shortfall was directly attributable to the absence of earned commissions tied to the Phoenix Brands transaction, not to any protected activity. **Exhibit 41**. FranConnect applied its commission policy uniformly and for legitimate, non-retaliatory reasons unrelated to Mr. Yates's complaints or EEOC charge. Indeed, there is no evidence that FranConnect deviated from its standard payroll practices or treated Mr. Yates differently from any other employee whose customer defaulted. Absent proof that Mr. Yates was entitled to the disputed commissions or that FranConnect acted with retaliatory animus, his retaliation claim based on alleged commission denial and paycheck issues necessarily fails.

## CONCLUSION

WHEREFORE, FranConnect respectfully requests that this Court grant its Amended Motion for Summary Judgment and issue any such further relief the Court deems necessary and just.

Dated: January 20, 2026

Heather M. Lambert (VSB No. 79175)
NELSON MULLINS RILEY &
SCARBOROUGH LLP
1021 E. Cary Street, Suite 2120
Richmond, VA 23219
Heather.Lambert@nelsonmullins.com
Tel.: 804.533.3868

Kraig B. Long (pro hac vice)
NELSON MULLINS RILEY &
SCARBOROUGH LLP
100 S. Charles Street, Suite 1600
Baltimore, MD 21201
kraig.Long@nelsonmullins.com
Tel.: 443.392.9499

Sarah J. Steinberg (pro hac vice)
NELSON MULLINS RILEY &
SCARBOROUGH LLP
100 S. Charles Street, Suite 1600
Baltimore, MD 21201
sarah.steinberg@nelsonmullins.com
Tel.: 443.392.9443

*Counsel for Defendant*

31

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Defendants' Amended Memorandum In Support of its Motion for Summary Judgment was electronically filed via CM/ECF and a copy was sent via email to the counsel below:

Monique A. Miles
Old Towne Associates, P.C.
201 N. Union Street, Suite 110
Alexandria, VA 22314
*Counsel for Plaintiff*

_____

Heather M. Lambert (VSB No. 79175)
NELSON MULLINS RILEY & SCARBOROUGH
1021 E. Cary Street, Suite 2120
Richmond, VA 23219
Heather.Lambert@nelsonmullins.com
Tel.: 804.533.3868
Fax.: 804. 616.4129

*Counsel for Defendant FranConnect, LLC.*

32